English v. Newell.

---

DAVID C. ENGLISH, administrator &c., of William Van Deursen, deceased,

v.

WILLIAM A. NEWELL et al.

A testator gave to his widow the income of $2,000 for life, and to his son an annuity of $600, and a specific legacy to J., and directed his executors to invest the $2,000, and also a sum sufficient to produce the annuity. He appointed two executors, N. and H., who proved the will in 1873, and filed an inventory of the estate. N. received all the assets, and managed the estate alone for years. H. refused to take any part in the custody or management, and so stated to the beneficiaries, and they, by their conduct, acquiesced. In 1874 an account, purporting to be their joint account, was filed, and in 1879, under citation, a similar one was filed, but each was, in fact, the account of N., and contained only a statement of his receipts and disbursements. In 1881 both executors were removed, on a petition alleging that N. had wasted the estate, and complainant was appointed in their stead. There is no proof that either H. or the beneficiaries suspected the probity or solvency of N. before that time, nor that H. had any previous knowledge that N. was wasting the estate.—
Held, that H. was not personally liable for N.'s acts, or for the property that came to his hands, although he stated to J. that he "would not act as acting executor, but would keep N. straight."

---

Bill for relief. On final hearing upon pleadings and proofs.

English *v.* Newell.

*Mr. J. Kearney Rice* and *Mr. A. H. Strong,* for complainant.

*Mr. A. V. Schenck,* for defendant Hendrickson.

THE CHANCELLOR.

William A. Van Deursen, late of New Brunswick, deceased, died on or about February 13th, 1873. By his will, after ordering payment of his debts and funeral expenses, he gave to his wife $5,000, and certain household furniture absolutely, and the interest of $2,000 for life. He then gave to his son William an annuity of $600 for life, and gave to his grandson, John H. Van Deursen, a specific legacy. He then directed that, after paying his debts and the $5,000, his executors should invest a sum sufficient to produce the annuity to William, and that they should also invest the $2,000. He gave to his daughter Joanna, wife of William A. Newell, one-half of all the residue of his estate, including in that half, after the death of William, one-half of the fund to be invested to produce William's annuity ; and, after the death of his wife, one-half of the $2,000. The other half of the residue he gave to the children of his deceased son John and their heirs, in equal proportions, to be paid to them at the death of the mother of the children, and he gave to her the interest thereof for life. He appointed his son-in-law, William A. Newell, and his brother-in-law, Charles I. Hendrickson, executors, authorizing and directing them to sell his real estate at their discretion. The will was proved by both executors on February 27th, 1873, and they together filed an inventory of the estate on the 27th of March following.

The bill is filed by the administrator *de bonis non cum testamento annexo,* the executors having been removed from office. It states that Newell took upon himself the execution of the will and the administration of the estate, and received and took into his hands the assets to a large amount, and that Hendrickson never took into his custody any of the assets, and never, so far as the complainant is informed, and as he believes, took any active part in the management of the estate ; that the executors, on the 14th of July, 1874, filed a joint partial account ; that on

·or about the 1st day of September, 1879, in pursuance of cita-
tions issued to them by the orphans court of Middlesex county,
.at the instance of certain persons interested in the estate under
·the will, they filed another account, to which some of the children
·of John Van Deursen, deceased, filed exceptions, but the excep-
·tions were never brought to hearing because a compromise was
· made between the exceptants and Newell, in pursuance of which
·each of the children of John Van Deursen, deceased (except
·Charles A. Van Deursen, who has been absent and has not been
heard from for many years, and is believed to be dead), in con-
·sideration of certain moneys paid to them by Newell, released
.and discharged the executors from all claim for moneys then dis-
tributable, and it was admitted that there remained in Newell's
.hands, after such payment, $14,635.41, which amount was made
·up of the following sums : $11,000 invested ·to produce the annu-
·ity for William Van Deursen ; $2,000 ·invested for the testator's
widow, and $1,635.41, the share of the before-mentioned Charles
A. Van Deursen of the money which was distributable when the
·compromise was effected ; that by the compromise it was agreed
that the account should be restated so as to show a balance of the
above-mentioned sum of $14,635.41 ; that a restatement of the
account was prepared accordingly, but it was never filed, and
the bill alleges that it remains in Newell's hands ; that on or
.about the 10th of January, 1881, two of the children of John
Van Deursen, deceased, filed a petition in the orphans court
.setting forth that Newell had wasted the money of the estate,
.and that he refused and neglected to pay the interest due the
testator's widow and the annuity due to William Van Deursen,
.and that Hendrickson refused to have anything to do with the
estate, and praying that the letters testamentary granted to the
·executors might be revoked ; that under that petition the com-
plainant was appointed administrator *pendente lite,* and that sub-
.sequently, the executors having been removed, he was appointed
.administrator *de bonis non cum testamento annexo ;* that under
the first appointment he received from Newell's attorney certain
.securities amounting in the aggregate to. $8,773.60 of principal,
.but has never received any more of the assets, and that on a just

accounting it would appear that there was, at the time of the compromise, a larger balance than $14,635.41 in Newell's hands.

The bill further states that among the credits claimed by Newell in the account then made was one of $9,664.40, which he claimed to have paid to his wife, but the complainant says he is informed and believes that Newell has never paid it, and that he has no receipt or voucher for it, nor any release from it, and the complainant insists that the executors are accountable for it, with interest from July 1st, 1874. The bill further states that Newell claimed credit for money paid William Van Deursen which he had not in fact paid; that the complainant believes that the assets not accounted for have been employed by Newell in his own business and diverted to his own use, and the complainant insists that if that is the case Newell should be held accountable therefor. The bill states that Newell resides out of this state, but that at the time of filing the bill he was temporarily here, but intended soon to leave the state. It prays that the defendants (Newell and Hendrickson) may answer; that Newell may make discovery as to the assets; that Newell and Hendrickson may state and settle the account of their executorship in this court, and that Newell may be decreed to pay over the balance which may be found due upon such settlement, and that in default of such payment by him, Hendrickson may be decreed to pay it, and it prays a writ of *ne exeat* against Newell.

It appears very clearly from the evidence that, although both executors proved the will and joined in the inventory, Newell alone had possession of the assets, and that he alone took the entire management of the estate. He even made leases of the real estate, although the executors had only a power of sale, and made them in his own name, and received the rents. Although a sheriff's deed upon sale under foreclosure was taken in the names of both executors, it was so taken by Newell without Hendrickson's knowledge. The bill states that Newell took upon himself the execution of the will and the administration of the estate, and received and took into his hands the assets, and that Hendrickson never took into his custody any of the assets, nor, so far as the complainant is informed, and as he be-

lieves, took any active part in the management of the estate. The same facts are stated also in the petition in the orphans court for the removal of the executors, and in the petition for the appointment of an administrator *pendente lite.* It is urged that the executors filed two joint accounts, and that their joint liability is thereby established. It is true that where executors jointly settle their final account they are jointly liable for the balance in their hands, as ascertained by the account and the decree of the court thereon. *Laroe* v. *Douglass, 2 Beas. 308.* But while an account may purport to be a joint account, it may in fact be only a separate one. If so, it does not create a joint liability in equity. *Fennimore* v. *Fennimore, 2 Gr. Ch. 292; Beatty* v. *Cory Universalist Society, 14 Stew. Eq. 563.* There is no evidence in this case that any joint final account was in fact ever made, nor that any account was filed which of itself, because it was joint, should impose any liability whatever upon Hendrickson to answer for any of the assets or for the management of the estate or any part of it in any way. The account of 1874 was not a final account, but an intermediate one only. It purports to be joint, but it was not such in fact. It was the account of Newell only. It was sworn to by him alone, and it was filed by him alone. It may be true that Hendrickson was present when it was drawn up or when instructions were given by Newell for drawing it, but it was not his account. He had had none of the assets, and had taken no part in the management of the estate. The bill says so. He had no account to make, and did not intend to make any, whether joint or several. The account filed in September, 1879, under the citation, also purports to be a joint account, but it is also sworn to by Newell alone, and was prepared and filed by him. It is in fact entirely an account of his receipts, disbursements and transactions, and in no way an account of any receipts, disbursements or transactions of Hendrickson. There were none such. The attorney by whom the account was drawn up says that Hendrickson had nothing whatever to do with the making, preparing or stating of that account or the supplement thereto. When Hendrickson proved the will he declared to those interested that on account

of his age he would take no part in the settlement of the estate,
but would leave it to Newell, and it was understood by them
from the beginning that such was his determination.  Not only
does he testify to this, but he is corroborated by the testimony
of John H. Van Deursen, who is a principal witness for the
complainant.  Hendrickson says in his answer (and he supports
the statement by his testimony) that the persons interested in
the estate acquiesced in his determination to have nothing to do
with the settlement, and that they consented that Newell should
alone take the assets and administer them ; and he is corrobo-
rated by the conduct of those persons.  They at all times recog-
nized the fact that Newell had all the assets and was administer-
ing them alone, and that Hendrickson had neither had any of
them, nor taken any part in the management of the estate.
This appears, as before stated, in the proceedings in the orphans
court, and in the statements of the bill in this suit.

It is true John H. Van Deursen says that what Hendrickson
said, when he proved the will, was that he " could not act as
acting executor, but would keep Newell straight." To which
the witness says he replied that if he (Hendrickson) left it all to
Newell, they (the legatees) would not get a cent; because Newell
did not attend to anything.  He says that his reason for saying
this was that he had always understood in the family that Newell
did not keep his business appointments, and (he adds) he was
away too much at Washington, and besides was engaged in pol-
itics.  He does not say that he questioned the pecuniary respon-
sibility or integrity of Newell.  Nor does it appear that there
was any reason for doubting either his solvency or his probity.
He was at that time reputed to be wealthy.

It is urged that under the circumstances it was the duty of
Hendrickson to protect the estate against loss, by the misconduct
or mismanagement of his co-executor.  Executors are not neces-
sarily liable for each others acts, or responsible for the property
which comes to each other's hands.  As a general rule, they are
answerable for no more than they receive; but they may, by
their own conduct, make themselves answerable.  *Fennimore* v.
*Fennimore, ubi supra.*  The rule in regard to the liability of an

English *v.* Newell.

executor for money not received by him, but received and wasted or misapplied by his co-executor, is that if he knows that the assets received by his co-executor are not applied according to the trusts of the will or in a due course of administration, and he stands by and acquiesces in it, or suffers the assets to be wasted by his co-executor, without any effort to require or compel a due execution of the trusts and a due application of the assets in the course of the administration thereof, he will be held liable for any waste or misapplication of such assets. But it will be otherwise if he has no knowledge of such misapplication or waste. *Story Eq. Jur.* § *1280 a.* In *Hovey* v. *Blakeman, 4 Ves. 596,* it was held that one executor in trust is not answerable for the receipts of the other merely by taking probate, permitting the other to possess the assets and joining in acts necessary to enable him to administer, and that he is only answerable by concurring in the application of the assets. See, also, *Monell* v. *Monell, 5 Johns. Ch. 283 ; Sutherland* v. *Brush, 7 Johns. Ch. 17,* and *Ormiston* v. *Olcott, 84 N. Y. 339.*

In *Williams* v. *Nixon, 2 Beav. 472,* where two executors were directed, after making some annual payments, to invest and accumulate the surplus, one of them received the dividends of stock for several years and misapplied them ; it did not appear that the other had any knowledge of such misapplication. It was held that he was not answerable for the breach of trust. In that case Lord Langdale, M. R., said that there can be no doubt that if an executor knows that the moneys received by his co-executor are not applied according to the trusts of the will, and stands by and acquiesces in it, without doing anything on his part to procure the due execution of the trusts, he will, in respect of that negligence, be himself charged with the loss, but that in cases of that kind it is always to be observed that the testator himself, having invested certain persons with the character of executors, has trusted them to the extent to which the law allows them to act as executors, and in that character each has a separate right of receiving and giving discharges for the property of the testator ; that if, in the case before him, the defendant knew that his co-executor was misapplying the moneys received and

acquiesced in it, he became himself liable because he was a witness and an acquiescing party to the misapplication or breach of trust; but that if he was not aware of the misapplication, he (Lord Langdale) knew of no case in which the court had gone the length of saying that an executor should be held personally answerable for standing by and permitting his co-executor to do that which, for anything he knows to the contrary, was a performance of the trusts of the will.  He further said that, if he were to charge the defendant in that case generally with all the assets received by his co-executor, he must in every other case say that an executor who does not personally act, and who, having no reason to suspect any misapplication by his co-executor, permits him to act alone, is liable for every misapplication committed by his co-executor, and he adds that he does not think that he can lay down any such rule.  In the case before me the persons to whom the declarations of Hendrickson that he would not and could not act as executor &c., were made were not creditors, but were persons who were interested in the estate as legatees, and it is in their behalf that this suit is brought.  Under the circumstances it would seem that they themselves were bound to take action against Newell for the preservation of the assets in his hands, if they supposed that there was danger that the assets would be wasted or misappropriated.  The fact that Hendrickson made the declaration, and that he swears that they acquiesced in his determination is a very important circumstance.

According to the evidence the complaints which were made to Hendrickson were in reference to Newell's delay in paying William Van Deursen's annuity and the interest of the $2,000. John H. Van Deursen says that he expressed to Hendrickson a wish that the estate might be taken out of Newell's hands, and he says that he was quieted by what Hendrickson said in reply; that Hendrickson's conversation led him to believe that the estate would come out all right, and that he (Hendrickson) would see that it should all come out right; that Hendrickson said that the witness had no reason to complain; that Newell was well off, and would not use the estate's money.  He says that at that time Newell, so far as he knew, was reputed to be wealthy; that he

English v. Newell.

lived in good style, and had the appearance of being rich ; that Newell, about that time, had bought another farm. So that it appears, from the testimony of this witness, that there was no reason to suspect that Newell had wasted or misappropriated the estate, or to apprehend that he would do so. Hendrickson evidently did not suppose that the estate was in any danger in Newell's hands. Nor did any one suppose that there had been any waste or misappropriation. On the 9th of September, 1879, it was agreed between the proctor of the petitioners in the proceedings for the removal of the executors, and the proctor of Newell, that the application in those proceedings should be continued for two weeks from that time, upon Newell's agreement to assign securities to the amount of $6,500 to Hendrickson, to be held by him as the principal to produce the annuity of William Van Deursen, and the interest payable to the widow.. Hendrickson was not a party to this agreement. In pursuance of it Newell sent to him an order upon his attorney for certain securities. Hendrickson, being unable to get the money upon the order, as he had expected to do, refused to assume the trust, and at once gave notice of his refusal to those interested. He says that Newell spoke to him about accepting the order, and he told Newell that he would accept the money ; that he would take care of the money for the trust fund if it were paid into his hands. He says he did not want to take the trust. He also says that he demanded the money from the attorney, because the order was for money ; that he accepted the order only to have the money ; that he thought that if he had the money he could take care of it for the children. As before stated, when he found he could not get the money, he refused to take the trust. In November, 1879, all of the children of John Van Deursen, deceased, except Charles A. Van Deursen (who, as before stated, had long been absent, and had not been heard from for many years, and was supposed to be dead), settled with Newell for their interest in the estate, except their interest in the fund to produce the annuity for William Van Deursen, and the $2,000 invested for the benefit of the widow for life, and the share of Charles A. Van Deursen in the money which was, at that time,

distributable; and they released him accordingly. It may be added that while there is no proof that the money credited in the account made at or about that time (and upon which that settlement was made) as having been paid by Newell to his wife has been, in fact, paid, there is no evidence upon the subject. It does not appear that Newell has wasted the estate, or misappropriated any part of it, except as it is to be presumed from the fact that he has not turned over all of the assets pursuant to the order of the orphans court, made in July, 1881, requiring him to pay, deliver over and transfer to the complainant as administrator *de bonis non cum testamento annexo* all the assets which were in hand on the 21st of March, 1881, the date of the decree removing him from the office of executor. There is no evidence upon which Hendrickson can be equitably held liable to make up the deficiency. The persons interested in the estate might themselves have taken measures to bring Newell to an account years before they did so. They might have done so when the payment of interest was delayed. They knew that Hendrickson had declared in the outset that he would not be responsible for the assets or for the management thereof. If he said, in connection with such declaration, that he would "keep his co-executor straight," he certainly did not intend to promise to stand surety for Newell, or to assume any responsibility for his acts. There was no occasion for doing so ; for, as before remarked, none of the persons interested had any doubt about Newell's responsibility or his integrity. What Hendrickson meant by saying that he would keep Newell straight, if he used the expression, was that he would give Newell the benefit of his advice; that although he would not, and could not, on account of his age, undertake the duties of executor, and would not consent to take any responsibility, he would give the estate the benefit of his judgment in the management, if occasion should require. It is by no means probable, to say the least of it, that he meant that he would commit the assets and the management thereof wholly to his co-executor, and be responsible for him. When, in 1879, Newell gave to Hendrickson the order for the funds to secure the annuity to William and the interest to the widow, it was not

supposed that there was or would be any deficiency. No demand was then made upon Hendrickson to protect the estate. It was not supposed that it needed protection, but it was supposed that the funds were in existence, and would be handed over by Newell, or by his attorney in pursuance of his order. The waste or misappropriation was committed without Hendrickson's knowledge, and without any suspicion on his part that it would be committed. He neither knew nor suspected it, until after it was done. Under such circumstances, he is not answerable.

Nor is this conclusion in conflict with or in contrariety to the doctrine of the cases cited by the complainant's counsel. In *Laroe* v. *Douglass, 2 Beas. 308,* a surviving executor, Douglass, was held liable for the waste of his co-executor, Laroe. Not only had the executors in that case settled a joint final account, but Laroe had canceled a mortgage which was given to the executors to secure the payment of legacies, which the bill was filed to recover. The mortgage was upon the real estate of the testator, which was sold by the executors, and they took the mortgage for part of the purchase-money. Laroe became the owner of the property subject to the mortgage. He sold the property and improperly canceled the mortgage. Douglass knew he was about to sell, and notified the purchaser of the existence of the encumbrance. Laroe then called upon Douglass and told him that he (Laroe) could not make the sale except by canceling the mortgage, and said that he would pay the *cestui que trust.* Douglass was held liable, because he did not prevent, as he might have done, the meditated wrong of which he was fully apprised. In *Schenck* v. *Schenck, 1 C. E. Gr. 174,* the suit was against the executors of an executor. They had received a trust fund held by their testator at the time of his death, in his character of executor, and not as trustee. They had settled a joint final account on which they claimed and obtained credit for the fund in question. They were consequently both held liable. In *Fisher* v. *Skillman, 3 C. E. Gr. 229,* an executor was held liable for funds which his co-executor had wasted, but he had voluntarily placed the funds in the hands of his co-executor. In *Suydam* v. *Bastedo, 13 Stew. Eq. 433,* the liability of an executor

for funds of the estate which had been wasted by his co-executor, was based upon the fact that the executors had settled a joint final account.

Hendrickson has acted in good faith. He supposed and had reason to believe that those interested in the estate acquiesced in his openly declared determination not to act in the settlement of the estate, and consequently he did not act therein. If there was waste or misappropriation of the estate by his co-executor, he was not aware that it was about to take place. The bill should be dismissed as to him, but without costs.